v. Jeffrey Bauspis, et al., Defendant's Appellees. Arguing for the Appellant, James W. Kaiser. Arguing for the Appellees, John L. Quinn. Thank you. Mr. Kaiser, you may proceed. Very good. I'd first like to thank the court for taking this matter under consideration. My name is James Kaiser and I represent the plaintiffs in this case. First, let me discuss the defendant's actions in this case. Defendants were admittedly behind in their rent for over a year and then they had numerous conversations with the plaintiff's property manager, Suzanne Eisenberg, about this specific issue. Nothing changed during that one-year time. However, on July 26, 2019, Defendant Jeff Bauspies sent a text message to Ms. Eisenberg informing her that they were closing their doors as of August 31st, just six weeks away. The defendants were already in breach for non-payment of rent and they had just told the landlord they were going to breach again at the end of the following month. The only asset known was this gym equipment. Throughout this whole time, the defendants could have bonded over or paid the back rent. Regarding the changing of locks, there is no prohibition in the Act or we're talking about the distress for rent section about changing the locks. In fact, USA First Lane Door vs. Cousins Club, our Supreme Court specifically states the lessor can either seize the tenant's property and remove it from the premises or he restrains it and allows it to remain on the premises. Isn't that the equivalent of self-help? There is no provision for self-help in this statute and there is case law specifically indicating both the Yale Tavern case and an older case, Brooks vs. LaSalle National Bank, 11 Illinois Appellate 3rd, 791 at 797, a 1st District 1973 case, which specifically said self-help is not permitted. So how is this not self-help? I don't believe it's self-help, Judge, because when you consider what self-help is under that exact case that I was just talking about, the Cousins Club, the reference talks about the fact that the landlord could seize the property, sell it, and pay the money they're owed on rent. Completely self-help without any court involvement. The Cousins Club illustrates for us that the present statutory procedure substantially restricts the right of the landlord. He is now required to submit his claim for rent to a court and he can sell the property only after he obtains a judgment. So that's a different restriction on the complete self-help concept of it. Plus, I wanted to add to that the Chicago Landlord-Tenant Ordinance, which, while it's not any kind of authority for you, it certainly is something that the court should consider informative. If you look at Section 512.160, it provides that the landlord may change the locks, and consider that this is a residential lease in those cases, can change the locks when the landlord is in compliance with the law pertaining to the stress warrants. And in this case, the trial judge indicated specifically that we followed the procedure of the stress warrant precisely, but that the issue was in the execution by changing the locks. So we'd ask the court to consider the fact that even the city of Chicago has their landlord-tenant ordinance, which is a very progressive pro-tenant ordinance, allows for the changing of the locks. And I think that's very significant when we're looking for information in this case as to how to proceed in matters such as this. Well, but by doing that, I mean, wasn't the defendant constructively evicted from the premises and prohibited from conducting any business whatsoever? I mean, he wasn't going to cease business until, I believe it was September. Actually, it was, well, so you're saying the same thing, end of August, August 31st, was last August 31st, right, September 1st. 10 days later, or 11 days later, depending on how you want to count the days. I wasn't, go ahead. He was going to be out of business at that time, that is true. And so if he was only constructively, if the court takes that position that it was constructive eviction, it would only be for the 10 to 11 days, because the rest of the time, they could have bonded over or paid the back rent. They chose to do neither, and yet then complain that they were constructively evicted. And I think the constructive eviction issue should end on the day they were leaving the property on August 31st, beginning September 1st. I think that rent should be, the acceleration should be allowed and permitted to be a claim against the defendants in this case. And the reason specific is because they were breaching, they had announced they were breaching their contract at that time. Well, is there some authority that says who acts first is the one who's responsible? I mean, it's six of one, half a dozen of the other. They said that they were going to cease business, which would be a breach of the lease because there was time left, but the doors were locked effectively within a few days after that announcement, so they couldn't do anything there. Which seems to be a pretty decisive move itself. So, I mean, is there some authority that says that their announced breach first counts more than the change of the locks? Well, I do think an anticipatory breach is an important aspect of this, when you consider that they were actively saying they weren't going to do it. But I also want the court to consider what activities they could do. They could not use any of the gym equipment if that was the case. And then you have to consider the additional cost of what Judge Bitar wanted to do is put a custodian in charge in a 24 hour a day gym to make sure no one's using the equipment. And that seems a little far-fetched to have to make that an additional requirement. In the testimony that you've read the transcript on, the only thing that they might have been able to do would be sit-ups, push-ups, and maybe a little bit of aerobics if there was some space to do that. People that go to these gyms with literally tons of equipment in it want to use that equipment. And I don't think they were going to be successful in continuing that for even those 11 days. So moving on it to make sure the equipment is not removed from the premises by the tenant, who also has other gym facilities, was protective for my client's business. They had had customers, actually tenants, fly out in the middle of the night and take property with them, leaving nothing for the landlord to use to pay the rent if they abandoned the premises. So there's a protective nature of that too about doing that. Plus, we have to look at the timing of how long it took to go through the process. The defendant in this case, your honors, filed a motion to dismiss and then filed a motion for partial summary judgment, which didn't get heard until I believe May of last year due to the pandemic. So those delays didn't help the aggravated a tad more, but the gym wasn't going to operate no matter what they did. So protecting the council, you said that the idea of a custodian was quote far-fetched, but there is a very, very old case back in 1888 Eames versus Mayer, which is the authority for doing just that. I mean, what does far-fetched mean? Why wouldn't that have been an appropriate instead of locking them out? Yeah, Eames didn't really work as it was designed to do. And when you look at it, the constable put a custodian in charge of the goods. I want to, that's for lack of a better word, the goods that were there. However, the tenant had assigned the interest in the property to a third party. That third party removed the custodian from property and took possession of the goods. The case is between the two sides. It was not between the landlord and the tenant. So there's a difference maker there. Also, you started your oral argument with what I consider to be a negative pregnant, and that is that you stated that it wasn't prohibited. Well, you didn't say that it was authorized. So could you cite some authority that indicates that locking the building within a commercial business parcel of real estate isn't a constructive eviction despite citing the most august authority, which is a city of Chicago ordinance that relates to residential property? Judge, there isn't much authority on these things. As you well know, you have old cases like we were talking about that may not have application. But I think if a statute, and remember these statutes are based on the common law, and the common law is modified by the statute when the legislature thinks that there's some need to act on a locks shall not be changed. So that is where I would be headed on that justice. Also, I beg to differ with your historical understanding of what the I and when you say common law, I assume you mean the common law of England. Is that correct? Yes. And the early look, I think that they based a lot of those early cases, Your Honor, on the common law, there's references in those early cases, the 1880s cases, and prior to that, they would base them on activity actions from the common law. Well, originally, you're correct. Back before there was legal precedent, there was self help. And it was self help in virtually everything. Because that's the whole theory behind not having a government. If there's government to help you protect your rights, property or otherwise, then you have to do it by self help. And early on in the history of England, it was self help. But somewhere along the way, the king or the queen decided that it was inappropriate to use self help in such situations and created the English common law relating to forcible entry, detainer, distress, and so on and so forth. So when you refer to the common law, and the concept of self help, you're kind of talking about dinosaurs and and not the flora or fauna of today. Um, let's get to the understanding that you also said that the tenant and its members, once the distress warrant was issued, couldn't use the equipment. And I find that hard to believe so long as the equipment didn't have a custodian to watch over it. And it wasn't removed from the present premises. And so I don't on what basis is your statement that nobody had the right to use it once the distress warrant was issued, when you didn't remove the equipment from the premises? I believe the idea of the word distraint is the is the non use of that equipment, the requirement of that equipment that I submit to you that it's not just non use, it's you taking possession. And if it was taken possession improperly, then the defendant had the ability to replevy the goods if in fact, your taking was wrongful. So there is a quid pro quo, there's a pro, there's an anti there's a counter, there's a clockwise and anti clockwise, your argument, to my knowledge, is not historically correct. Either you take it or you don't take it. And if you don't take it, if you then prevent people from using it while it's on the premises, because you haven't taken it, how is it that you supposedly have some right to literally do what I would call a reverse distress, which is leave the property in place and kick keep the people away from the property that's on the premises, that until they they reach the date upon which they indicated they would cease business, they had the right to be there because based upon forcible entry and detainer, you hadn't done the you needed to do to have them evicted properly. I would like to go back to the USA one lane door versus cousins, cousins club. And in that case, it does say that the lessor or he can distrain it and allow it to remain on premises. And that seems to be an important aspect of being able to leave the property there and put it in a non use situation. So that's not sure I'm answering your question, Your Honor, but that's the position we have. Any other questions? No, thank you. No. Thank you, sir. Your time is up, you'll be given an opportunity to make a rebuttal. Thank you. Thank you. Mr. Quinn, you may proceed. Thank you. I think it's helpful to view the distinction between personal property and real property. And when you look at section three in the act, it the legislature clearly identified that a distress warrant was an action against personal property. And I think that specifically excludes an action against real property, and they distinguish the personal property from the premises. So I think it's very clear that the legislature intended this to just be an action against personal property. And if you you take an act like changing the locks, you are necessarily, you know, the fact of the matter is they can call it a distress warrant, but it's primarily an action against the real property. The other thing that I think is important to note is that in section three, they very, the legislature expressly prohibits that it, the distress warrant should not operate against the property of another person. And if you have, if you were under plaintiff's interpretation, where you're able to just simply lock out the building or lock out the premises, then any property, virtually every item of personal property in that premises is now affected by the distress warrant. And in this case, there was a third party property that was essentially seized. And council even admits in the brief that it had to actually return some of this property at a later date. So, you know, just along that grounds, specifically, the distress warrant was improper because it sees property belonging to the other individuals. How much time does it take to get a distress warrant? Well, you do it yourself. So I mean, you, you, you all does that then mean that it's ASAP as soon as possible? Yes. Yes. And how long does it take to get an eviction order that's enforced in a forcible entry and detainer action? Well, it takes quite a bit longer as a practical matter, you have to serve a five day notice, then you have to get up in court. My experience with evictions is that the soonest you can have somebody out of a property is about a month. Um, so if you use a distress warrant, and you change the locks, you're effectively short circuiting forcible entry and detainer by at least a month, I would argument, I would agree with that, Your Honor. In fact, frankly, if the if the appellate court were to take the position that you could do a distress warrant by simply changing the locks, I think it'll become a commonplace practice be by by landlords everywhere. Well, what happens if there is no personal property on on the premises? Could you put a tenant then sport a distress warrant on the basis that it really, there's nothing there to distress and therefore this is a subterfuge for a forcible entry and detainer action? Well, I think I don't think you could do if you couldn't inventory at least one item of property. But in virtually all cases where the defendant would still be in possession of property, there would be something that you could inventory. One of the one of the thoughts I had is, you know, you could have an attorney and he gets a phone call from a landlord and says, Oh, I got this problem tenant. I changed the locks because he's not paying his rent. And then the attorney says, Oh, well, you're not supposed to do that. That's self help. You can't do that. And then they rehabilitate the situation by simply filing a distress warrant the next day. If he can identify a single piece of property, a single piece of personal property on the on the premises, then you can just file a distress warrant and say, Oh, yeah, that's why we changed the lock. So I think it leads to a ludicrous result. And it completely undoes the the prohibition against self help. And it creates an alternative method of eviction, essentially, if if we were to follow the the plaintiff's interpretation of the law, and I clearly, yes, I have another question. Wasn't your email of July 26 2019, in essence, anticipatory repudiation, repudiation, and indication that the defendants were going to abandon this property. And didn't that trigger the it would seem to me that that's the effect of what happened? Well, I don't think I don't think I, my understanding of an anticipated anticipatory repudiation is that it relieves the obligation of a party's further performance. And so I don't think that that an anticipatory repudiation is enough to trigger the acceleration clause. And I don't think that the acceleration clause under the terms of this lease was automatic. It was something that that, in a sense that the that the landlord had to, you know, an option that they had to exercise it, the fact that they may have, you know, they the fact that they were going out of business, and they could not no longer run after a certain date. You know, that may be well and true, but it doesn't entitle the landlord to break the law by using self help in going go in ahead of time. They could have filed an eviction suit if they wanted to get them out of the property as soon as possible. And done that, as far as accelerating the rent. The fact of the matter is, is that the the law is is that once a constructive eviction occurs, a landlord, a tenant is relieved from paying future rent. So if if, yeah, it's correct that if the plaintiffs had not wrongfully evicted the tenant, then they could have gone after this future rent. But the fact that they did commit this wrongful act before, you know, they could get a judgment for accelerated rent or accelerate the rent, I think relieves them of that activity. A a kind of a time, you know, it's not a he was constructively evicted for these 10 days until it was over. It's a constructive eviction happens. And once it happens, that's it, the lease is terminated. And the obligations of the tenant under the lease are terminated. That's that's what the law is, I believe. But it wasn't pursuant to the terms of the lease wasn't the notice that this business was going to terminate on August 31. Within the terms of the leaf, at least a hindrance or limitation on their ability to do business. That's the section. And that would, would it not trigger the right to use this acceleration clause? I don't, I don't believe that because the breach had not actually occurred. I don't believe that it automatically triggers the acceleration clause for the same reason that think if he if he had done a regular had actually filed a proper eviction, he would have had to give a notice of at least five days that allowed that would have given the opportunity to cure the breach. So I don't think I don't think that, that, you know, the initial moment that there was some kind of breach, if the rent was late or anything, it automatically triggers all all rent being due, I think there has to be, you know, some sort of notice some sort of demand based on a breach that says this is all due. And I don't think it says that an anticipatory breach in the in the lease, I don't think it states that anticipatory breach, or the declaration that one intends to leave the premises allows for the acceleration of rent sooner than the lease actually terminates when you know, he leaves possession of the lease. So I just don't think it's in there like that. Is there a notice or me as a notice indicating the abandonment of the leasehold is irrevocable? Is there any authority on that? I don't believe that there's any authority that says that, that, that email that that the substance of that email irrevocably you know, could not be revoked. I think that if under the terms that are here, if for some reason they were able to stay in business and bring the rent current, they could have done that. The email was not a formal termination of the lease, I think it was just to provide the landlord information. The landlord and the tenant were working back and forth trying to solve this trying to resolve this issue. The tenant was up front with the landlord that they weren't making money that they were having trouble staying in business. They were meeting with other parties. And so the landlord and the tenant were kind of had an open lines of communication. And I think frankly, I think that should be encouraged. I don't think it would be good to make it so that tenants never communicate their problems with landlords, lest it be taken for an anticipatory breach of the lease. The judgment that was entered was for rent due and owing prior to the changing of the locks, is that correct? That is, that is correct. And then there was a set off based upon the value of the equipment that was distressed. Well, I actually I believe that the set off was based on on some sort of damages that were caused by the by the lockout, there was, there was some sort of because the the tenant operated a snap fitness, which I guess is, you know, it's like a fitness chain. And so the the tenant had contracts with the, you know, it's the larger corporation and the larger corporation had some sort of requirements that they be in business for certain days and a certain number of days. So I believe what happened was that, because they were shut down prematurely, there was some sort of problem or some sort of fine or some sort of amount that had to be paid to the the larger corporation. And that the trial court, you know, ruled that because that that shouldn't have occurred, that it was a wrongful eviction, that those should be offset. So the equipment was ultimately used to satisfy the judgment that the landlord got? Yes, that's, that's my understanding. So, so on the day that the judgment was entered, the equipment hadn't been already sold. So it hadn't been offset. I believe, and, and candidly, I wasn't involved with this aspect of the case, another attorney at my firm was, so I don't know specifically, Mr. Kaiser probably would. But I, but my understanding was that then the property was sold, and then that amount went against the judge, or is that not correct? And I don't want to speak. I guess, I don't know exactly what happened after the judgment was entered. Well, the, the judgment seems to indicate, the September 20th judgment says, the plaintiff may sell the levy equipment. So it sounds like it hadn't been sold yet. I don't know why they put may sell if it had already been sold. So yeah, the equipment hadn't been sold at that time. I know. I'm just saying, I don't know what happened after the judgment to the equipment. But the fact remains, it wasn't sold in that interim period. So it was still probably in the premises, while they were trying to re, maybe re-rent or modify the property, right? That's my understanding. And, and, and that also brings up a final issue that I had, which is, I believe that the plaintiffs had a obligation to try to mitigate any losses. And that should also, it should also relieve them from having to pay future and accelerated rent. If, if the, if the defendants, if the plaintiffs are going to, you know, either take no efforts to, to re-rent the space, or alternatively, their plan is to essentially double dip and collect this rent and then relate to somebody else. They shouldn't be allowed to do that. And there is a requirement under the law that a, a landlord attempt to mitigate against losses. Thank you. Are there any other questions? No, thank you. No. Thank you, sir. Your time is up. Thank you. Kaiser, you may proceed with rebuttal. Thank you. So briefly speaking, they, I can tell you about the property, the, the judgment was entered and the defendant paid off the balance of the judgment. The property is still secured and not sold as of this date, still on the premises. Now on, on the acceleration of rent, acceleration is a concept that doesn't come up very often. And not all leases would have something like that in it. In my, in my perspective, an acceleration of rent means that there is no mitigation of damages by the definition, because it says all the rent due after this date is now due right now. That's what acceleration is. There is no opportunity or requirement of mitigation. There is no recalculation later on at some later date for authority for that. No, I it's, it's my opinion. When you think logically through what acceleration means, if there's a clause that says all the rent is accelerated, that means there's a dollar amount that can be liquidated from looking at the balance of rent. And we had it being over $150,000 when we and so that would be a liquidated amount that is not offset by any mitigation because of the nature of, of an acceleration clause in the way I'm looking at it. But the fact remains, you could have, you could have leased this premises out in the interim and that entire acceleration would not be, you wouldn't be entitled to the entire acceleration because then you'd be double dipping, wouldn't you? Correct. And, but I'm not sure that's the application here. It would, would a tenant be able to file suit possibly and say, you re-rented the property and I need some money back. I don't know. I've never been in that position on, on these cases. So that's a little bit confusing as to what the end result might be in such a case. It is a damages, acceleration of damages. I suppose somebody, you know, years later after the lease is done, could go back. But most times when a tenant goes out and when a tenant does fail, they go out of business and almost permanently unless they're moving to another location. So there is no collection. There is no way to collect money when those kinds of events happen. So that's why we don't see too many of those circumstances is by estimation. Well, the fact remains that if the property is locked for any reason, how are they going to, how are they going to use it to make the money to pay the rent? Well, I guess it's, you know, the blocks or the dominoes are, they're either straight up or they're, they've fallen over in a, in a very picturesque way. So if the property is being distrained in any way on the premises or off premises, the tenant is not able to use that property. They'd be having to do something else. And the testimony in the trial was they could do sit-ups, push-ups, or maybe some aerobics. And again, I've been repeating myself. I know that again, these people that sign up for these gyms want to do the weights, want to do the stepper equipment. They don't want to sit and do aerobics for the money that they're paying to use that equipment. So that's, I don't think that's a fair assessment of what that business could do to survive. They would not have the income to be able to do that. If we're talking about the time period that they were disrupted, it's 11 days. And if they were, if you feel that they were constructively evicted for 11 days, so be it. But the balance of the rent based on the default and the default in the lease says that Justice Hutchinson actually had that language correct. It basically says that they're liable for all of the, of the rent upon the default. And that default is the anticipatory breach. The notice that was received is the breach. Plus we were already in breach under the lease for the non-payment of rent for almost a year, about a year. So when you look at the circuit, I'm sorry. Well, so on September 1st, you gave them the keys back so that they could go in and exercise and do aerobics? No, we did not because we were proceeding. The case had gone to pleadings. I'm not sure if at that point in time we had our first court date and there was a motion to dismiss first filed by the defendants and then a motion for partial summary judgment. Again, some of these same points that we're discussing today were brought up, brought up in the trial court. And the trial court did not see fit to handle it in the way that we're talking, but um, when I can, when I consider the fact that they were not going to operate the business, there was a distinct statement from them. So that would, in my mind, trigger the acceleration for the balance due under the lease. Mr. Kaiser, what is your response to the series of questions that I asked Mr. Quinn regarding the timeframe for obtaining a distress warrant and perfecting it vis-a-vis the timeframe for perfecting and obtaining an eviction of the premises? So an eviction, I believe Mr. Quinn is correct. It's a month to perhaps a little bit longer. Commercial leases generally take more time because there's more issues that come up on commercial leases than residential leases. So you could be longer on a, on a commercial lease. A distress warrant is an interesting animal because it is, you go to the property and you would seize the property on a specific date. And then you would file as soon as possible. I believe that's what statute says, the distress warrant. So the afternoon or the rest of the day on the 20th, I believe is when it was executed. The landlord was inventorying all the property. Then you take the inventory and put it with the distress warrant and we filed it the very next day. And the summons then is issued. And then there's a return date on that summons. That's the procedure on that. So that's where the court is involved from the second day. Any other questions? Just one. Counsel, you rely on the Elliott case for the point or proposition that a lessee's duty to pay rent survives eviction under the forcible entry and detainer act. But here, the defendant's eviction was really not first section of the act or second section, but really, and not even the third, it was self-help, which pursuant to some of the questions earlier, I know Justice McLaren asked about the authority to use self-help and change the lock. So how would Elliott be apposite? Well, Elliott, I think was the case itself was a forcible injury detainer case. And you have to go to the contract where it talks about the remedies not exclusive. And I believe that's the trigger for that language. Elliott used that had the same language in it that was enforced by the court in that case. And I think that was just the selection as to what that specific case was would be my position on that. So since if it was a distress warrant, perhaps they would have said in a notice to collect in the remedies not exclusive provision, which was the language used in Elliott to get to that point that we're talking about, Your Honor. Thank you. I have no other questions. Justice Hutchinson? No, I have none. Thank you. Thank you. We'll take the proceedings under advisement and render a disposition in Mr. Clerk, will you please close out the proceedings? Have a good day, gentlemen. Thank you very much.